IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AIMEE KNIGHT,                                3:18-cv-01580-BR

         Plaintiff,                          OPINION AND ORDER

v.

JEFFREY DURBIN and CITY OF
GRESHAM,

         Defendants.


**RICHARD H. RIZK**
Richard Law
0434 S.W. Iowa St.
Portland, OR 97219
(503) 245-5677

         Attorney for Plaintiff

**DAVID C. LEWIS**
**RICHARD PAUL FREUD**
Kraemer & Lewis
P.O. Box 1469
Lake Oswego, OR 97035
(503) 763-3875

         Attorneys for Defendants


1 - OPINION AND ORDER

**BROWN, Senior Judge.**

This matter comes before the Court on Defendants' Motion (#12) for Summary Judgment. The Court concludes the record is sufficiently developed such that oral argument would not be helpful to resolve Defendants' Motion. For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion as follows:

1. **GRANTS** Defendants' Motion as to the impropriety of Officer Durbin as the defendant in Plaintiff's state-law claims and, therefore, **SUBSTITUTES** the City of Gresham as the defendant in Plaintiff's state-law claims;

2. **GRANTS** Defendants' Motion as to Plaintiff's Fourth Claim for negligent retention; and

3. **DENIES** Defendants' Motion as to Plaintiff's First, Second, Third, Fifth, and Sixth Claims because the Court concludes Defendants have not established as a matter of undisputed fact and/or law entitlement to judgment on these claims.

## BACKGROUND

The following facts are taken from the parties' Joint Statement of Agreed Material Facts and the parties' filings related to Defendants' Motion for Summary Judgment and are

2 - OPINION AND ORDER

undisputed unless otherwise indicated.

On June 15, 2017, 10:20 a.m., Gresham Police Officer Matt
Hardy radioed to dispatch:  "My folks with warrants from earlier
are reported to be at McDonald's.  I'm in the area.  Send me
another car."  Joint Statement of Agreed Facts at ¶ 3.[1]  Officer
Hardy also advised "they're probably going to run."  *Id*.

At 10:24 a.m. Officer Hardy radioed dispatch that the two
suspects were fleeing on foot from the McDonald's restaurant
located at S.E. Stark Street in Gresham, Oregon.  Joint Statement
of Agreed Material Facts at ¶¶ 3-4.  Officer Hardy described the
male suspect as wearing a "red and gray sweatshirt" and the
female suspect as wearing a "dark-colored hoody with brown hair
in a bun."  Joint Statement of Agreed Facts at ¶¶ 4-5.  The
female suspect was wanted on a warrant for felony heroin
possession.  Joint Statement of Agreed Facts at ¶ 1.

At 10:26 a.m. a Gresham police officer radioed dispatch that
the suspects described by Officer Hardy were headed westbound and
had jumped over a fence.  Joint Statement of Agreed Facts at ¶ 5.
Other Gresham police officers, including Defendant Officer
Jeffrey Durbin, began "converging on the scene."  Joint Statement
of Agreed Facts at ¶ 6.  Another Gresham police officer (call

---

[1] The time stamps on the dispatch recording do not match the
time stamps on the Plaid Pantry videos submitted in evidence.
The exact time of day of the events, however, is not material to
the Court's resolution of Defendants' Motion.

sign 8156) asked dispatch for an updated description of the suspects.  The dispatcher replied:  "You have a male, red and gray sweatshirt, should be with a female in a dark hoody."  Joint Statement of Agreed Facts at ¶ 6.  "Both suspects were reported to be 'white.'"  *Id*.

At 10:29 a.m. "Officers 161 and 8145" radioed dispatch that they had located the male suspect at the O'Reilly Auto Parts store on S.E. Stark Street, which was one block west of the McDonald's restaurant where the pursuit began.  Joint Statement of Agreed Facts at ¶ 7.

At some point shortly before 10:30 a.m.[2] Plaintiff Aimee Knight entered the Plaid Pantry at the corner of S.E. Stark Street and S.E. 181st Avenue in Gresham through the only entrance.  Decl. of David Lewis, Ex. 6 at 10:25:41.  Plaintiff was wearing a baseball hat and a black hoody with a gold circle on the back and the hood pulled up over her baseball hat.  *Id*. Plaintiff crossed the store away from the entrance and selected nasal spray.  Approximately 40 seconds after Plaintiff entered the store, she went down the aisle that was the farthest away from the entrance to select some chips.  Lewis Decl., Ex. 6 at

---

[2] The time stamp on the videos of the security camera footage from Plaid Pantry indicate Plaintiff entered the store at 10:25 a.m. and that Defendant entered the store at 10:26 a.m.  As noted, these times do not synchronize exactly with the times of the dispatch recordings, but the disparity is not material to the Court's analysis.

10:26:20.  Due to the height of the shelving and the items on the
shelves, Plaintiff was unable to see the entrance from that aisle
and she was not visible from the entrance.

At 10:30 a.m. Officer 8145 radioed dispatch:  "There was a
female running across to the Plaid Pantry, she had a black hoody
on with the hoody up if you want to check her."  Joint Statement
of Agreed Facts at ¶ 8.  Plaid Pantry is across S.E. 181st Avenue
directly to the west of O'Reilly Auto Parts on S.E. Stark Street
where the male suspect had been apprehended and less than two
blocks west of the McDonald's where the pursuit began.  Joint
Statement of Agreed Facts at ¶ 8.

Less than one minute after Plaintiff entered the Plaid
Pantry, Officer Durbin entered the Plaid Pantry following up on
the message from dispatch about the "female running across to the
Plaid Pantry."  Lewis Decl., Ex. 6 at 10:26:33.  Officer Durbin
entered the Plaid Pantry 13 seconds after Plaintiff turned into
the chip aisle, and, therefore, he was unable to see her and she
was unable to see him.

The Plaid Pantry video does not include sound.  Officer
Durbin, however, testified at deposition that when he entered the
store he asked the clerk "if a white female with a black hoody up
on her head had run into the store."  Lewis Decl., Ex. 1 at 5.
Officer Durbin testified the store clerk "pointed to the back of
the store."  *Id*.  The Plaid Pantry video reflects the store clerk

pointed to the area where Plaintiff was approximately seven seconds after Officer Durbin entered the Plaid Pantry. Lewis Decl., Ex. 6 at 10:26:40. At that time Plaintiff was in the middle of the aisle farthest from Defendant and from the door. Plaintiff was unable to see whether there were other people in the Plaid Pantry due to the height of the shelving and the store layout.

Officer Durbin testified at deposition that he "called out to the person, said that he knew she was in the store and to show her hands and come out to me." Lewis Decl., Ex. 1 at 5. Officer Durbin testified he could not see Plaintiff, but Plaintiff "did not show her hands as ordered" and at that point he pulled out his gun and put it in the ready position. *Id*. at 6. Plaintiff testified at deposition that she first heard Officer Durbin say "something along the lines of turn around. Hands up. On the ground," but to her "it sounded like it was coming from outside" so she continued to shop. Lewis Decl., Ex. 8 at 2. Plaintiff heard Officer Durbin a second time and realized he was inside the store, but she "assumed . . . the store was either being robbed or they had chased somebody in there. So . . . [she] turned around to see what was going on." *Id*. The video reflects Officer Durbin raised his gun and pointed it at the area where Plaintiff was located five seconds after the clerk pointed to the back of the store and before Plaintiff was out of the chip aisle.

Lewis Decl., Ex. 6 at 10:26:45. Officer Durbin testified at
deposition that he "did not see [Plaintiff's] face before [he]
pulled [his] gun. . . . So [he] was not able to identify the
person before [he] pulled the gun." Lewis Decl., Ex. 1 at 7.
Officer Durbin advanced with his gun drawn toward the area where
Plaintiff was standing. The video shows Plaintiff putting her
hands out from her side and beginning to get down on her knees
five seconds after Officer Durbin drew his weapon. Lewis Decl.,
Ex. 6 at 10:26:50. Plaintiff testifies Officer Durbin told her
to lie face down on the ground with her arms out, at which point
she told him: "Sir, I'm not supposed to lay on my chest. I had
a botched mastectomy and I have a collapsed expander." Pl.'s
Resp., Ex. A(1) at 8. According to Plaintiff, Officer Durbin
"screamed at me to lay down," so she did. *Id*. The video shows
Plaintiff was fully prone on the ground with her arms out ten
seconds after Officer Durbin drew his weapon. Lewis Decl., Ex. 6
at 10:26:57. Officer Durbin continued to point his firearm at
Plaintiff and radioed to ask the other officers whether the
suspect had "a gold circle on her back, on the hoody?" Lewis
Decl., Ex. 3 at 6. Another officer responded: "I couldn't
tell." *Id*.

    Approximately 30 seconds after Plaintiff was fully prone on

the floor, Gresham Officer McFarland[3] entered the Plaid Pantry
and joined Officer Durbin. Lewis Decl., Ex. 6 at 10:27:24. As
Officer McFarland made his way to Officer Durbin, Officer Durbin
lowered and holstered his gun. Lewis Decl., Ex. 6 at 10:27:27.
Five seconds after Officer McFarland entered the Plaid Pantry,
Officer Hardy entered the Plaid Pantry. Lewis Decl., Ex. 6 at
10:27:29. Officers Durbin and McFarland handcuffed Plaintiff as
Officer Hardy made his way over to Officer Durbin. Lewis Decl.,
Ex. 6 at 10:27:35. A fourth unidentified police officer entered
the Plaid Pantry during the handcuffing. Lewis Decl., Ex. 6 at
10:27:38.

Approximately 30 seconds later "the woman was identified as
[Plaintiff]. She was not the woman with [the] warrant [that]
officers were searching for. [Plaintiff] was released from
handcuffs. Officer Hardy . . . radio[ed] 'And this isn't her so
we need to keep looking for her.'" Joint Statement of Agreed
Facts at ¶ 11; Lewis Decl., Ex. 6 at 10:28:29.

On July 18, 2017, Plaintiff filed a Complaint in Multnomah
County Circuit Court against John Doe and the City of Gresham
alleging state-law claims for false arrest, assault, and battery
based on the events of June 15, 2017.

On August 4, 2017, Plaintiff filed an Amended Complaint in

---

[3] None of the other officers involved in this encounter are
defendants in this action.

Multnomah County Circuit Court against John Doe, Officer Durbin, and the City of Gresham alleging state-law claims for false arrest, assault, and battery.

On August 18, 2018, Plaintiff filed a Second Amended Complaint in Multnomah County Circuit Court against Officer Durbin and the City of Gresham alleging state-law claims for false arrest, assault, battery, and negligent retention and federal claims for arrest without probable cause and excessive force in violation of the Fourth Amendment to the United States Constitution.

On September 26, 2018, Defendants removed the matter to this Court on the basis of federal-question jurisdiction.

On April 1, 2019, Defendants filed a Motion for Summary Judgment as to all of Plaintiff's claims.

## STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a genuine dispute as to a material fact. *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1223 (9th Cir. 2012). In response to a properly supported motion for summary judgment, the nonmoving party must

go beyond the pleadings and point to "specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) "This burden is not a light one. . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *Id.* (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

"A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009)(citation omitted). When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC*

*Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)

(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149

(9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

## DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims on the grounds that (1) Officer Durbin had reasonable suspicion to investigate Plaintiff; (2) Officer Durbin's conduct did not convert his interaction with Plaintiff into an arrest; (3) even if the interaction was converted into an arrest, Officer Durbin had probable cause to arrest Plaintiff; (4) even if the interaction was converted into an arrest and Officer Durbin did not have probable cause to arrest Plaintiff, Defendants are, nevertheless, entitled to qualified immunity on Plaintiff's federal claim for arrest without probable cause; (5) Defendants are entitled to qualified immunity on Plaintiff's federal claim for excessive force; (6) Officer Durbin is not a proper defendant on Plaintiff's state-law claims; (7) Officer Durbin was justified in detaining Plaintiff, and, therefore, Plaintiff's claims for

false arrest, assault, and battery fail; and (8) Plaintiff has not established a genuine dispute of material fact exists as to her claim for negligent retention.

## I.   Investigatory Stop and/or Arrest

Plaintiff alleges in her Fifth Claim that Officer Durbin arrested her without probable cause in violation of the Fourth Amendment.  In her Response to Defendants' Motion for Summary Judgment, Plaintiff asserts she was "de facto" arrested by Officer Durbin without probable cause in violation of the Fourth Amendment.  Plaintiff, however, also states in her Response that there is a "genuine issue[] of material fact regarding . . . whether Officer Durbin had probable cause *or* reasonable suspicion to believe [Plaintiff] was the suspect he sought."  Pl.'s Resp. at 12 (emphasis in original).  Thus, Plaintiff appears to assert Officer Durbin violated her Fourth Amendment rights by conducting an investigative stop without reasonable suspicion and/or by *de facto* arresting Plaintiff without probable cause.

### A.   Investigatory Stop

In *Terry v. Ohio*, the Supreme Court created a limited exception to the general requirement that officers must have probable cause before conducting a search.  392 U.S. 1, 30 (1968).  The Court held that officers may conduct an investigatory stop consistent with the Fourth Amendment [when] "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . ."  *Id*.  In addition, an officer may conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that "the persons with whom he is dealing may be armed and presently

> dangerous." *Id*. The stop and the frisk, must be
> analyzed separately; the reasonableness of each must be
> independently determined.

*United States v. I.E.V.*, 705 F.3d 430, 440 (9th Cir. 2012)
(citation omitted).

Under *Terry v. Ohio* a police officer may "seize" a
person for an investigatory stop if there is reasonable suspicion
that the person has committed or will commit a crime. 392 U.S. 1
(1968). "[R]easonable suspicion exists when an officer is aware
of specific, articulable facts which, when considered with
objective and reasonable inferences, form a basis for
particularized suspicion" that the person detained is engaged in
criminal activity. *United States v. Cotterman*, No. 09-10139,
2013 WL 856292, at *31 (9th Cir. Mar. 8, 2013)(citation omitted).
An officer may perform a *Terry* stop only when under the "totality
of the circumstances" there is a "particularized and objective
basis for suspecting legal wrongdoing." *I.E.V.*, 705 F.3d at 440
(citation omitted). Reasonable suspicion requires only "a
minimal level of objective justification." *Illinois v. Wardlow*,
528 U.S. 119, 123 (2000).

The record reflects Officer Durbin was advised there
was a suspect wanted on a warrant for felony heroin possession
who had begun running from police officers less than two blocks
from the Plaid Pantry. The suspect was described as a white
female wearing a dark-colored hoody sweatshirt. At the same time

the officers were looking for the female suspect, Officer Durbin was advised there was a woman wearing a black hoody running into the Plaid Pantry.  Plaintiff points out that the suspect was described as having brown hair in a bun, but Plaintiff has blonde hair.  Officer Durbin, however, testified at deposition that he did not remember hearing that the suspect had brown hair.  In addition, the record reflects Plaintiff's hair was covered by a hat and the hood of her sweatshirt during her entire encounter with Officer Durbin.

Considering the totality of the circumstances, the Court concludes as a matter of law that Officer Durbin initiated a *Terry* stop of Plaintiff when he entered the Plaid Pantry to look for the female suspect, called out to Plaintiff, said he knew she was in the store, asked Plaintiff to show her hands, and directed her to come out before he drew his weapon.

In addition, the Court concludes Officer Durbin had the required minimal level of objective justification to initiate the stop because he was aware there was a white female suspect wearing a dark-colored hoody sweatshirt who ran from police from a location that was close to the Plaid Pantry and close in time to when Plaintiff (a white female wearing a black hoody sweatshirt) was seen entering the Plaid Pantry.  The Court, therefore, concludes on this record that the *Terry* stop was supported by reasonable suspicion.

**B.    Conversion to Arrest**

Plaintiff asserts even if the *Terry* stop was justified initially by reasonable suspicion, Officer Durbin's actions transformed the *Terry* stop into an arrest without probable cause when he drew his weapon and pointed it at Plaintiff.

The Ninth Circuit has observed "[t]here is no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).

> Rather, in determining whether stops have turned into arrests, courts consider the "totality of the circumstances." As might be expected, the ultimate decision in such cases is fact-specific.
>
> In looking at the totality of the circumstances, we consider both the intrusiveness of the stop, *i.e.*, the aggressiveness of the police methods and how much the plaintiff's liberty was restricted and the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. In short, we decide whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*. As a result, we have held that while certain police actions constitute an arrest in certain circumstances, *e.g.*, where the "suspects" are cooperative, those *same* actions may *not* constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists. "The relevant inquiry is always one of reasonableness under the circumstances."

*Id.* (citations omitted; emphasis in original).

The Ninth Circuit has held a stop is not automatically

converted into an arrest when officers point their weapons at a suspect, use handcuffs, and place the suspect in a police car for questioning. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995). *Compare United States v. Steel*, 486 F. App'x 690, 690-91 (9th Cir. 2012)(concluding the officer's use of handcuffs was justified and did not convert a *Terry* stop into an arrest when the suspect did not comply with the officer's commands and made a movement with his right elbow towards his right side, which made the officer concerned that the suspect was either carrying a firearm or attempting to discard contraband); *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009)("[B]ecause the purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence, we allow intrusive and aggressive police conduct without deeming it an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers."); *Alexander v. Cty. of Los Angeles,* 64 F.3d 1315, 1320 (9th Cir. 1995)("The use of force during a stop does not convert the stop into an arrest if it occurs under circumstances justifying fears for personal safety.") *with Washington*, 98 F.3d at 1187 (*Terry* stop converted to an arrest when police ordered the plaintiffs from their car at gunpoint; frisked, handcuffed, and placed the plaintiffs in patrol cars while officers investigated allegations; and, at the same time, plaintiffs were compliant and

the officers had merely a generalized concern that plaintiffs might be armed); *United States v. Del Vizo*, 918 F.3d 821, 825 (9th Cir. 1990)(there was a "lack of investigatory justification for" handcuffing and making the plaintiff lie on the ground even though he was suspected of drug trafficking because the plaintiff complied with the officers' commands and there was not any other evidence to suggest that the plaintiff was "particularly dangerous.").

As to "the aggressiveness of the police methods and . . . the justification for the use of such tactics," the Ninth Circuit has held "'pointing a loaded gun at a suspect [and thereby] employing the threat of deadly force, is use of high level of force.'" *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018)(quoting *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)).

Here there is not any affirmative evidence that the suspects police were seeking were dangerous or armed. Although the female suspect was wanted on a warrant for felony possession of heroin, the Ninth Circuit has held outstanding felony warrants alone do not establish a safety risk. *See, e.g., Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994)("the existence of the [felony] warrants is of limited significance. A wide variety of crimes, many of them nonviolent, are classified as felonies."). *See also Smith v. City of Stockton*, No. 2:15-CV- 00363-KJM-AC, 2018 WL

3831001, at *4 (E.D. Cal. Aug. 13, 2018)("An outstanding felony warrant also does not alone show a safety risk."). Here neither the dispatch nor the officers' reports indicate any affirmative suggestion that either suspect being pursued was armed or thought to be armed. For example, there is not any indication in the record that the suspect had been in a location such as her vehicle or residence where she could have had access to and taken possession of a firearm during the pursuit.

Officer Durbin, however, testified at deposition that his "experience and training [taught him] that a fleeing suspect has a reason to flee. They could be armed, they could be carrying contraband." Lewis Decl., Ex. 1 at 3. Officer Durbin stated the reason he believed the suspect could be dangerous is because "in my training and experience, a fleeing suspect is dangerous." *Id*. Officer Durbin, nevertheless, also testified there was "nothing specific to [the suspect] that was dangerous." Lewis Decl., Ex. 1 at 4. Courts have held generalized beliefs or concerns for safety are insufficient to support a high level of force. *See, e.g., Hunter v. Durell*, No. C16-1445-MJP, 2018 WL 6249789, at *12 (W.D. Wash. Nov. 29, 2018)("Officer Durell claims . . . he 'had no idea what [the plaintiff's] intentions in getting into [his] car were,' and [he] believed [the plaintiff] might be reaching for weapons. . . . [T]his entirely unsubstantiated belief, without more, cannot justify the use of

deadly force.").

        The Court notes Plaintiff did not immediately respond
to Officer Durbin's command to "show her hands and come out,"
which is an objective fact that would heighten the concern of any
police officer in these circumstances.  Officer Durbin, however,
was not aware Plaintiff did not know he was addressing her, and
there is not any evidence that Officer Durbin identified himself
as a police officer.  Indeed, the video shows Plaintiff could not
see Officer Durbin at the time he commanded Plaintiff to put her
hands out, and, in fact, Officer Durbin testified he could not
see Plaintiff's face and was unable to identify her at the time
he pulled his weapon.  Nevertheless, Plaintiff put her hands out
and began to get on the floor a mere five seconds after Officer
Durbin entered the store and issued the command.  Although a
five-second delay in compliance may be of concern to a police
officer, courts have recognized an individual's immediate failure
to respond to police commands is an insufficient basis for an
officer to fear for his safety in the absence of other factors.
*See, e.g., Thompson v. Rahr*, 885 F.3d 582, 595 (9th Cir. 2018)
("When an officer gives a command, a fearful arrestee may require
a longer-than-expected interval to understand the order and
follow it."); *Hunter*, 2018 WL 6249789, at *12 ("[The plaintiff's]
only infraction was failing to respond promptly when commanded to
leave and attempting to open his car door to do so.").  Thus,

viewing the evidence in the light most favorable to Plaintiff, the Court concludes the justification for force in these circumstances was low.

In summary, Officer Durbin pointed his weapon at Plaintiff even though he did not have a specific basis to believe that she was dangerous or in possession of a weapon, and Plaintiff complied with Officer Durbin's commands when she realized they were directed at her and within five seconds of Officer Durbin issuing them.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes Defendants have not established as a matter of undisputed fact that Officer Durbin had a sufficient basis to fear for his safety and to warrant the intrusiveness of pointing a firearm at Plaintiff along with the other actions he took. Moreover, even though the entire encounter lasted less than two minutes, it involved a high-level use of force on an individual who was not an objectively established safety risk. The Court, therefore, concludes as a matter of law that Officer Durbin's conduct converted the *Terry* stop into an arrest.

### C. Probable Cause

Defendants contend Officer Durbin had probable cause to arrest Plaintiff because the suspect was wanted on an outstanding warrant and/or because Plaintiff failed to comply with his lawful commands.

## 1.   Outstanding Warrant/Mistaken Identity

"In a case of mistaken identity, 'the question is whether the arresting officers had a good faith, reasonable belief that the arrestee was the subject of the warrant.'" *Sharp v. Cty. of Orange*, 871 F.3d 901, 910 (9th Cir. 2017)(quoting *Rivera v. Cty. of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014)).  *See also Hill v. Cal.*, 401 U.S. 797, 802 (1971)("[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest.")(citation omitted)).  "The constitutionality of the arrest thus turns on the reasonableness of the [officer's] mistake." *Sharp*, 871 F.3d at 910.

The record reflects the only information that Officer Durbin had about the female suspect was that she was white, wearing a dark-colored hoody, and was seen two blocks from the Plaid Pantry.  Officer Durbin testified at deposition that he did not remember hearing that the female suspect had brown hair in a bun.  The Court finds in this case that the description of the suspect was vague and lacks the kind of specificity required to support a finding of probable cause.  *See, e.g., Grant v. City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002)("As a matter law, [the plaintiff's] resemblance to a general physical description could not have provided the officers with probable cause to

arrest him."); *Washington*, 98 F.3d at 1190-91 ("The only basis for linking Washington and Hicks to the supermarket robberies was the purported general similarity of their physical characteristics to those of the actual suspects: two African-American males, one reasonably short and one reasonably tall. [These] descriptions [are] exceedingly vague and general. . . . If the general descriptions relied on here can be stretched to cover Washington and Hicks, then a significant percentage of African-American males walking, eating, going to work or to a movie, ball game or concert, with a friend or relative, might well find themselves subjected to similar treatment."); *United States v. Ricardo*, 912 F.2d 337, 342 (9th Cir. 1990)(officers did not have probable cause to arrest a suspect because he fit the description of a "thin man, not too tall" and "young Mexican male").

Although Officer Durbin had a reasonable suspicion to stop Plaintiff and to investigate further, the Court concludes on this record that Defendants have not established the description of the suspect was sufficiently detailed for Officer Durbin to have probable cause to believe that Plaintiff was the subject of the warrant.

### 2. Commission of Separate Crime

Defendants also contend Officer Durbin had probable cause to arrest Plaintiff for the misdemeanor offense of

interfering with a police officer.

"An officer has probable cause to make a warrantless arrest when the facts and circumstances within his knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011)(citing *Crowe v. Cty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010)). "The analysis involves both facts and law. The facts are those that were known to the officer at the time of the arrest. The law is the criminal statute to which those facts apply." *Rosenbaum*, 663 F.3d at 1076. Oregon Revised Statutes § 162.247(1)(b) makes it a Class A Misdemeanor when "the person, knowing that another person is a peace officer . . . [r]efuses to obey a lawful order by the peace officer."

As noted, Plaintiff could not see Officer Durbin or anyone else in the store at the time Officer Durbin issued his commands to Plaintiff; Officer Durbin could not see Plaintiff's face or identify her when he pulled his weapon; and there is not any evidence in the record that Officer Durbin identified himself as a police officer when he issued his commands. Moreover, there is not any evidence in the record that Plaintiff knew Officer Durbin was a police officer when he initially issued his commands, and, in any event, Plaintiff complied within five seconds of the time Officer Durbin drew his weapon.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes on this record that Defendants have not established as an undisputed fact that a reasonable officer in Officer Durbin's position would have believed there was a fair probability that Plaintiff had committed the offense of interfering with an officer. The Court, therefore, concludes Defendants have not established Officer Durbin had probable cause to arrest Plaintiff for interfering with an officer.

In summary, the Court concludes Defendants have not established Officer Durbin, at the time he acted against Plaintiff, had probable cause to arrest her as the suspect wanted on the outstanding warrant or for interfering with an officer.

## II. Qualified Immunity Relating to Arrest

As noted, Defendants assert even if Officer Durbin's actions converted the stop into an arrest for which he did not have probable cause, Defendants are entitled to qualified immunity because under the totality of the circumstances a reasonable officer would not have known he was violating any clearly-established law.

Qualified immunity applies when an official's conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known. *White v. Pauley*, 137 S. Ct. 548, 551 (2017). "Police officers are not entitled to qualified immunity if (1) the facts '[t]aken in the

light most favorable to the party asserting the injury' show that
'the [officers'] conduct violated a constitutional right' and
(2) 'the right was clearly established' at the time of the
alleged violation." *Thompson v. Rahr*, 885 F.3d 582, 586 (9th
Cir. 2018)(quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).
*See also Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589
(2018)(Officers are entitled to qualified immunity unless (1) the
officers violate a federal statutory or constitutional right and
(2) the unlawfulness of their conduct was "clearly established at
the time."). Courts "may address these two prongs in either
order." *Thompson*, 885 F.3d at 586 (citing *Pearson v. Callahan*,
555 U.S. 223, 236 (2009)). "These inquiries are questions of
law." *Thompson*, 885 F.3d at 586 (citations omitted).

   "Clearly established means that, at the time of the
officer's conduct, the law was sufficiently clear [such] that
every reasonable official would understand that what he is doing
is unlawful." *Wesby*, 138 S. Ct. at 589 (citations omitted). *See
also Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir.
2018). "To be clearly established, a legal principle must have a
sufficiently clear foundation in then-existing precedent. The
rule must be settled law, which means it is dictated by
controlling authority or a robust consensus of cases of
persuasive authority." *Wesby*, 138 S. Ct. at 589-90 (citations
omitted). *See also Perez v. City of Roseville*, 882 F.3d 843,

856-57 (9th Cir. 2018)(noting Ninth Circuit precedent is sufficient to meet the clearly-established prong of qualified immunity).  When examining whether a legal principle is clearly established, courts must define the law with a "high degree of specificity" and not "at a high level of generality."  *Id*. at 590.  Although it is not necessary to identify a case that is "directly on point," generally the plaintiff must identify some authority that has held an officer acting under similar circumstances violated a federal right.  *Id*. at 590.  Whether a right was clearly established is a question of law.  *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017).  The Supreme Court has made clear that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Wesby*, 138 S. Ct. at 589 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Court has concluded it was well-established at the time of the incident that "individuals may not be subjected to seizure or arrest without reasonable suspicion or probable cause, especially when the stop includes detention . . . at gunpoint, and that highly intrusive measures may not be used absent extraordinary circumstances."  *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1052 (9th Cir. 2014)(citing *Washington*, 98 F.3d at 1192-93).

At the time of the events in question here, it was well-

established that "in a case of mistaken identity, 'the question is whether the arresting officers had a good faith, reasonable belief that the arrestee was the subject of the warrant.'" *Sharp*, 871 F.3d at 910 (quoting *Rivera*, 745 F.3d at 389). In addition, the law at the time was clear that the kind of vague and generic description of a suspect like the one available to Officer Durbin is insufficient to support probable cause. *See, e.g., Grant*, 315 F.3d at 1088 ("As a matter law, [the plaintiff's] resemblance to a general physical description could not have provided the officers with probable cause to arrest him."); *Washington*, 98 F.3d at 1190-91 ("The only basis for linking Washington and Hicks to the supermarket robberies was the purported general similarity of their physical characteristics to those of the actual suspects: two African-American males, one reasonably short and one reasonably tall. [These] descriptions [are] exceedingly vague and general. . . . If the general descriptions relied on here can be stretched to cover Washington and Hicks, then a significant percentage of African-American males walking, eating, going to work or to a movie, ball game or concert, with a friend or relative, might well find themselves subjected to similar treatment."); *Ricardo*, 912 F.2d at 342 (officers did not have probable cause to arrest a suspect because he fit the descriptions of a "thin man, not too tall" and "young Mexican male").

As noted, at the time of the events at issue Oregon Revised Statutes § 162.247(1)(b) defined it as a Class A Misdemeanor when "the person, knowing that another person is a peace officer . . . [r]efuses to obey a lawful order by the peace officer." As the record reflects, Plaintiff could not see Officer Durbin when he issued his commands; Officer Durbin did not identify himself as a police officer; and Plaintiff complied with Officer Durbin's commands as soon as she understood he was speaking to her. The Court concludes it was clearly established at the time of these events that a police officer in Officer Durbin's position under these circumstances would have known that he lacked probable cause to arrest Plaintiff for interfering with an officer.

On this record the Court concludes Defendants have not established Officer Durbin is entitled to qualified immunity as to Plaintiff's Fifth Claim for arrest without probable cause.

In summary, the Court concludes Officer Durbin has failed to establish that he did not violate Plaintiff's Fourth Amendment rights when he arrested her or that he has qualified immunity for those actions that constituted an "arrest" of Plaintiff. Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Plaintiff's Fifth Claim.

**III. Qualified Immunity Related to Excessive Force**

In her Sixth Claim Plaintiff alleges Officer Durbin "arrested [her] with force that was objectively unreasonable

under the circumstances." Pl.'s Second Am. Compl. at ¶ 48. In
her Response to Defendants' Motion Plaintiff asserts Officer
Durbin used excessive force when he pointed his firearm at her
and handcuffed her. Defendants assert Officer Durbin is entitled
to qualified immunity because the force he used was reasonable,
and, in any event, it was not clearly established that the force
he used was unreasonable under the circumstances.

As noted, "[p]olice officers are not entitled to qualified
immunity if (1) the facts '[t]aken in the light most favorable to
the party asserting the injury' show that 'the [officers']
conduct violated a constitutional right' and (2) 'the right was
clearly established' at the time of the alleged violation."
*Thompson,* 885 F.3d at 586.

### A. Constitutional Violation

When a plaintiff "'alleges excessive force during an
investigation or arrest, the federal right at issue is the Fourth
Amendment right against unreasonable seizures.'" *Thompson*, 885
F.3d at 586 (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1865
(2014)).

In *Thompson* the Ninth Circuit directed courts to
"approach an excessive force claim in three stages":

> First, we assess the severity of the intrusion on
> the individual's Fourth Amendment rights by
> evaluating the type and amount of force inflicted.
> Then, we evaluate the government's interests by
> assessing the severity of the crime; whether the
> suspect posed an immediate threat to the officers'

> or public's safety; and whether the suspect was
> resisting arrest or attempting to escape.
> Finally, we balance the gravity of the intrusion
> on the individual against the government's need
> for that intrusion.

885 F.3d at 586 (quotations omitted; citation omitted).

### 1. Severity of the Intrusion

The Ninth Circuit has made clear that "'pointing a loaded gun at a suspect [and thereby] employing the threat of deadly force, is use of a high level of force.'" *Id.* (quoting *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)). Thus, the severity of the intrusion on Plaintiff's Fourth Amendment rights was high.

### 2. Government's Interests

As noted, the Court must evaluate the government's interests "by assessing the severity of the crime; whether the suspect posed an immediate threat to the officers' or public's safety; and whether the suspect was resisting arrest or attempting to escape." *Thompson*, 885 F.3d at 586. As noted, Officer Durbin suspected Plaintiff was the suspect wanted on a warrant for felony possession of heroin. In such circumstances, however, the Ninth Circuit has held outstanding felony warrants alone do not establish a safety risk. *See, e.g., Chew*, 27 F.3d at 1442 ("the existence of the [felony] warrants is of limited significance. A wide variety of crimes, many of them nonviolent, are classified as felonies."). *See also Smith*, 2018 WL 3831001,

at *4 ("An outstanding felony warrant also does not alone show a safety risk.").

In addition, neither the dispatch nor the officers' reports include any information suggesting either suspect that the officers were seeking was armed or that they had been in a location such as their vehicle or residence where they could have obtained a firearm during the pursuit. Officer Durbin testified at deposition that his "experience and training [taught him] that a fleeing suspect has a reason to flee. They could be armed, they could be carrying contraband." Lewis Decl., Ex. 1 at 3. Officer Durbin also stated he believed the suspect could be dangerous because "in [his] training and experience, a fleeing suspect is dangerous." *Id*. Officer Durbin, however, also testified there was "nothing specific to [the suspect] that was dangerous." Lewis Decl., Ex. 1 at 4.

Courts have held generalized beliefs or concerns for safety are insufficient to support a high level of force such as pointing a firearm. *See, e.g., Hunter*, 2018 WL 6249789, at *12 ("Officer Durell claims . . . he 'had no idea what [the plaintiff's] intentions in getting into [his] car were,' and [he] believed [the plaintiff] might be reaching for weapons. . . . [T]his entirely unsubstantiated belief, without more, cannot justify the use of deadly force.").

The record here does not suggest Plaintiff was

resisting arrest or attempting to flee, and, in addition, Plaintiff complied with Officer Durbin's commands within five seconds.  As noted, even if a mere five seconds was not considered to be immediate under the circumstances, courts have recognized an individual's immediate failure to respond to police commands is an insufficient basis for an officer to fear for his safety in the absence of other factors.  *See, e.g., Thompson*, 885 F.3d at 595 ("When an officer gives a command, a fearful arrestee may require a longer-than-expected interval to understand the order and follow it."); *Hunter*, 2018 WL 6249789, at *12 ("[The plaintiff's] only infraction was failing to respond promptly when commanded to leave and attempting to open his car door to do so.").

Thus, viewing the record in the light most favorable to Plaintiff, the Court concludes the government's interest in using a high level of force against Plaintiff was low under these circumstances.

### 3. Balancing

Balancing the gravity of the intrusion on the individual against the government's need for that intrusion, the Court notes the Ninth Circuit has concluded on several occasions that pointing weapons at suspects in circumstances even more extreme than those in this case can be a constitutional violation.

For example, in *Robinson v. Solano County* the plaintiff used a shotgun to shoot two dogs on his property. The plaintiff killed one dog and wounded the other. A neighbor owned both dogs and called the police to report that the plaintiff had shot her dogs and was "in the street yelling." 278 F.3d 1007, 1009 (9th Cir. 2002). "The police sent out a radio dispatch regarding a man carrying a shotgun who had just shot two dogs and 'is in the middle of the street yelling at this time.'" *Id.* Meanwhile the plaintiff had returned home and was deciding whether to call the authorities when he saw six police vehicles pull up outside of his house.

> [The plaintiff] decided to go out and explain the incident to them. Wearing an unbuttoned shirt and a pair of jeans, he walked the 135 feet from his front door to the street. He asserts that the officers were able to see him approach, and that they observed that his demeanor was calm. He also states that the officers kept their guns holstered as he approached. Officers Cauwells and Faulkner, however, contend that [the plaintiff] appeared agitated, and that they unholstered their guns upon first seeing him.
>
> As [the plaintiff] neared the street, Officer Cauwells . . . walked forward to meet him. [The plaintiff] said, "My name is Robinson and I'm the man that was involved with the dogs." Officer Cauwells then pointed his gun at [the plaintiff's] head from a distance of about six feet. Officer Faulkner also took out his gun and pointed it at [the plaintiff]. Cauwells told [the plaintiff] to put his hands over his head. As [the plaintiff] was putting his hands up, he asked the officers "What's going on?" Without answering the question, Cauwells repeated the command as he stepped forward, and according to [the plaintiff], thrust his gun three or four feet from [the

> plaintiff's] head.

> * * *

> Two [other] police officers handcuffed [the
> plaintiff] and shoved him into the back seat of
> their patrol car.  [The plaintiff] was confined in
> the police car while the officers talked to [the
> dog owner] and other neighbors.  The interval was
> approximately 15–30 minutes. . . .  The officers
> released [the plaintiff] after they ascertained
> that he had not violated the law.

*Id*. at 1010.  The plaintiff brought an action for, among other

things, excessive force in violation of his rights under the

Fourth Amendment.  At trial the court granted the defendants'

Rule 50 motion for judgment as a matter of law on the ground of

qualified immunity.  The plaintiff appealed.  A three-judge panel

of the Ninth Circuit reversed and found the defendants were not

entitled to qualified immunity.  The Ninth Circuit then "took

this case *en banc* in order to clarify the law of the circuit

regarding excessive force that violates the Fourth Amendment's

protections against unreasonable searches and seizures, and to

clarify the law of the circuit on the scope of qualified immunity

for excessive force claims."  *Id*. at 1009.  As to the

constitutional-violation prong of the qualified-immunity

analysis, the Ninth Circuit noted "[t]he only dispute is whether

the officers' use of a drawn gun pointed at [the plaintiff's]

head from close range constituted excessive force."  *Id*. at 1013.

The court noted "it is not alleged that any of the factors

justifying the use of force were present."  Specifically, "[t]he

crime under investigation was at most a misdemeanor; the suspect was apparently unarmed and approaching the officers in a peaceful way.  There were no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumbered the plaintiff." *Id*.  In fact, the "only circumstances in this case favoring the use of force was the fact that plaintiff had earlier been armed with a shotgun that he used to shoot the neighbor's dogs." *Id*.  The Ninth Circuit held the plaintiff's "earlier use of a weapon, that he clearly no longer carried, is insufficient to justify the intrusion on [the plaintiff's] personal security. He therefore has alleged a claim of excessive force in violation of the Fourth Amendment."  *Id*.

In *Thompson v. Rahr* King County Sheriff's Deputy Copeland witnessed the plaintiff commit "multiple traffic violations."  Deputy Copeland pulled the plaintiff over and asked for his information.  Deputy Copeland discovered the plaintiff had a suspended license for an unpaid ticket, that he was a convicted felon, and that his most recent felony conviction was for possessing a firearm.  885 F.3d at 584.  Deputy Copeland had the plaintiff exit the vehicle and patted him down for weapons. Deputy Copeland radioed for backup and had the plaintiff sit on the bumper of Deputy Copeland's patrol car.  At some point another sheriff's deputy arrived and watched the plaintiff, who continued to sit on the bumper of the patrol car 10-15 feet away

from the plaintiff's car while Deputy Copeland conducted an inventory search of the plaintiff's vehicle. Deputy Copeland found "a loaded revolver sitting in an open garbage bag on the rear passenger-side floorboard" of the plaintiff's car. *Id*. at 585. "After seeing the gun, Copeland decided to arrest [the plaintiff] for violating the Uniform Firearms Act." *Id*. Deputy Copeland "signaled to the deputy watching over [the plaintiff], then drew his gun." *Id*. Deputy Copeland alleged "he unholstered his firearm and assumed a low-ready position, with his gun clearly displayed but not pointed directly at [the plaintiff]." *Id*. The plaintiff, however, asserted Deputy Copeland pointed his gun at the plaintiff's head, demanded that he surrender, and threatened to kill him if he did not. Deputy Copeland directed the plaintiff "to get on the ground, face-down, so that he could be handcuffed. [The plaintiff] complied and was cuffed without incident." *Id*. The plaintiff brought an action against Deputy Copeland and King County alleging Deputy Copeland used excessive force "in pointing his gun at [the plaintiff] and threatening him." *Id*. The district court granted the defendants' motion for summary judgment on the ground of qualified immunity. In evaluating the district court's decision, the Ninth Circuit first concluded Deputy Copeland violated the plaintiff's Fourth Amendment right to be free from excessive force. The court noted Deputy Copeland used a "high level of force," the plaintiff was

suspected of "potential crimes of low and moderate severity," and
the plaintiff was "not actively resisting arrest or attempting to
evade arrest by flight." *Id*. at 586-87. The court concluded
"[i]n the end, 'pointing guns at persons who are compliant and
present no danger is a constitutional violation.'" *Id*. at 587
(quoting *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009)
(citing *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005)(*en
banc*)). The Ninth Circuit held "[a] jury could find that
'brandishing a cocked gun in front of [the plaintiff's] face' and
threatening to kill him was unreasonable under these particular
circumstances." *Thompson*, 885 F.3d at 587 (quoting *Robinson v.
Solano Cty.*, 278 F.3d 1007, 1015 (9th Cir. 2002)(*en banc*)). The
Ninth Circuit noted it did not "discount the concern for officer
safety when facing a potentially volatile situation. But [when]
the officers have an unarmed felony suspect under control . . .
and . . . the suspect is not in close proximity to an accessible
weapon, a gun to the head constitutes excessive force."
*Thompson*, 885 F.3d at 587. *See also Smith*, 2018 WL 3831001, at
*4 (finding the defendant used excessive force when he pointed
his gun at the plaintiff during a traffic stop even though the
defendant had an outstanding felony warrant and was larger than
the defendant because the record reflected the plaintiff did not
act aggressively, possess a weapon, and did not pose any
"immediate objective threat."); *Harris v. City of Henderson*,

No. 2:15-cv-0337-GMN-PAL, 2018 WL 4494081, at *7 (D. Nev. Sept. 18, 2018)(finding the defendant used excessive force by injuring the plaintiff's fingers when placing the plaintiff in handcuffs because the plaintiff's crime "was a misdemeanor at best," the plaintiff did not pose any immediate threat to the defendant, and the plaintiff's "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force.").

Here the record does not reflect any suspect possessed a firearm or any other weapon at the time of the encounter or that Officer Durbin had any reason to believe the suspect had a weapon. Plaintiff, like the plaintiff in *Robinson*, was not trying to escape and, from all objective indicators, was compliant with Officer Durbin's orders as soon as she realized he was speaking to her. In addition, unlike in *Thompson,* there is not any evidence on the record that the suspect ever possessed or had access to a firearm at the time of the encounter; Plaintiff was, at best, suspected of a low-level crime; Plaintiff was not trying to escape; and Plaintiff was compliant with Officer Durbin's orders as soon as she realized he was speaking to her.

The Court finds on this record that a reasonable jury could conclude Officer Durbin violated Plaintiff's Fourth Amendment right to be free from excessive force when he pointed

his gun at Plaintiff during their encounter.

**B.    Clearly-Established Right at the Time of the Violation**

Because the Court has concluded a reasonable jury could conclude Officer Durbin violated Plaintiff's Fourth Amendment right to be free from excessive force when he pointed his gun at her, the Court must now address whether "the right was clearly established at the time of the alleged violation." *Thompson,* 885 F.3d at 586.

As noted, in 2002 the Ninth Circuit in *Robinson* "took th[e] case *en banc* in order . . . to clarify the law of the circuit on the scope of qualified immunity for excessive force claims." *Id*. at 1009.  In *Robinson* the Ninth Circuit concluded the law was insufficiently established to find that "it would have been clear to the officers in 1995 [the time of the events at issue] that their alleged conduct was unlawful." 278 F.3d at 1015.  The Ninth Circuit specifically stated in *Robinson*, however, "as a general principle . . . pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger." *Id*.  *See Thompson*, 885 F.3d at 591 ("*Robinson's* holding was plain:  an officer who points his gun at the head of an arrestee who is cooperative and unthreatening, outnumbered by police, and apparently unarmed, violates the Fourth Amendment.  If the contours of this right

were not clearly established before we decided *Robinson*, they most certainly were thereafter.  Today's decision regrettably muddies *Robinson's* clear dictates, but it cannot overturn sixteen years of precedent.").

Similarly, in *Smith* the court evaluated Ninth Circuit precedent and concluded "in February 2013, it was clearly established law that a non-violent felon who poses no risk of harm has a right against having a loaded gun pointed at him during a traffic stop."  2018 WL 3831001, at *6.  In reaching its conclusion the court relied on *Robinson* and *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528 (9th Cir. 2010).  In *Espinosa* the court concluded the officers did not have qualified immunity when they pointed loaded guns at the plaintiff even though he was armed with a knife and tried to flee because the officers outnumbered the plaintiff, he had not been accused of committing any crime, and he did not pose a public danger.  *Id.* at 537-38.

Although there are factual differences between *Robinson*, *Smith,* and *Espinosa*, the Supreme Court has explained a plaintiff is not required to identify "a case directly on point" for a right to be clearly established.  *White v. Pauly*, 137 S. Ct. 548, 551 (2017)(citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).  "If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth

Amendment." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir.
2011). *See also Hope v. Pelzer*, 536 U.S. 730, 741 (2002)
("[O]fficials can still be on notice that their conduct violates
established law even in novel factual circumstances."); *Deorle v.
Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)("Otherwise,
officers would escape responsibility for the most egregious forms
of conduct simply because there was no case on all fours
prohibiting that particular manifestation of unconstitutional
conduct."). The question is whether existing precedent "placed
the statutory or constitutional question beyond debate" to the
extent that a reasonable officer in the defendant's position
would have known his behavior was unlawful. *Mullenix*, 136 S. Ct.
at 308. *See also White*, 137 S. Ct. at 551.

Here the factual differences between this case and
*Robinson* and *Thompson* underscore the sufficiency of Plaintiff's
excessive-force claim. The suspect who Officer Durbin sought was
never reported to be armed, and there is not any evidence in the
record that Officer Durbin had reason to believe that Plaintiff
was armed. In addition, unlike in *Robinson* and *Thompson*
Plaintiff was not near her residence, vehicle, or any place where
she could have obtained a weapon. Plaintiff was also smaller
than Officer Durbin, and she complied with his commands as soon
as she realized they were directed at her, which was no more than
five seconds after Officer Durbin raised his weapon and issued

his commands.

Accordingly, the Court concludes in June 2017 the law was clearly established that a nonviolent, unarmed, compliant individual who does not pose any risk of harm has a right not to have a loaded weapon pointed at her during an investigation and/or arrest. Viewing the record in the light most favorable to Plaintiff, the Court concludes Defendants have not established Officer Durbin is entitled to qualified immunity as to Plaintiffs Sixth Claim for excessive force in violation of Plaintiff's Fourth Amendment rights. Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Plaintiff's Sixth Claim.

## IV. Officer Durbin is not a proper defendant on Plaintiff's state-law claims.

Defendants assert Officer Durbin is not a proper defendant on Plaintiff's state-law claims because under the Oregon Tort Claims Act (OTCA), Oregon Revised Statutes §§ 30.260-300, a plaintiff who brings an action for a municipal officer's tortious conduct must name the public body rather than the individual officer when the officer was acting within the course and scope of his employment at the time the alleged tortious conduct occurred.[4] Or. Rev. Stat. § 30.265(3), (4).

--------

[4] The OTCA contains an exception to this requirement when the damages alleged exceed the OTCA limits. Or. Rev. Stat. § 30.265(3), (4). That exception is not relevant here.

It is undisputed that Officer Durbin was at all material times acting within the course and scope of his employment with the City of Gresham.  Plaintiff's state-law claims, therefore, must be brought against the City of Gresham.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to the impropriety of Plaintiff's state-law claims against Officer Durbin and substitutes the City of Gresham as the defendant as to Plaintiff's state-law claims.  *See* Or. Rev. Stat. § 30.265(3)("If an action is filed against an officer, employee or agent of a public body[,] . . . the court upon motion shall substitute the public body as the defendant.").

## V.  Plaintiff's State-Law Claim of False Arrest

In her First Claim Plaintiff alleges under state law that Officer Durbin falsely arrested her without probable cause.  Defendants, in turn, assert they are entitled to summary judgment on Plaintiff's First Claim because Officer Durbin had probable cause to arrest Plaintiff.

In Oregon the tort of false arrest has four elements: "(1) defendant must confine the plaintiff; (2) defendant must intend to accomplish the act that causes confinement; (3) plaintiff must be aware of the confinement; and (4) the confinement must be unlawful."  *Ross v. City of Eugene*, 151 Or. App. 656, 663 (1997).  Oregon courts have held a confinement is not "unlawful" when there exists any lawful basis for it such as

probable cause. *Miller v. Columbia County*, 282 Or. App. 348, 355 (2016)("the existence of probable cause does render an arrest lawful as a matter of law.").

Under Oregon law "[a] warrantless arrest is permissible . . . [when] the arresting officer has probable cause to believe that the person has committed a crime." *State v. Gibson*, 268 Or. App. 428, 430 (2015)(citing *State v. Mace*, 67 Or. App. 753, 756–57 (1984)). Under state law probable cause is defined as "a substantial objective basis for believing that, more likely than not, an offense has been committed and that the person to be arrested has committed it." Or. Rev. Stat. § 131.005(11). "Probable cause has two aspects: (1) the officer must subjectively believe that a crime has been committed, and (2) that belief must be objectively reasonable under the totality of the circumstances." *Gibson*, 268 Or. at 430 (citing *State v. Rayburn*, 246 Or. App. 486, 490 (2011)). *See also State v. Miller*, 345 Or. 176, 186 (2008)("[I]t is sufficient if the trial court finds . . . the officer reasonably believed that he had lawful authority to act, even if the officer's subjective basis for acting turns out to be incorrect. Of course, in order to prove a valid arrest, the state also must establish, in addition to the officer's subjective belief that he . . . had lawful authority to act, that the facts objectively are sufficient to establish probable cause."). "The subjective component of the

probable cause inquiry is satisfied if an officer believes that he . . . has lawful authority to restrain the individual's liberty." *State v. Vasquez-Villagomez*, 346 Or. 12, 23 (2009) (citing *Miller*, 345 Or. at 185). Even if the subject component of the probable cause analysis is satisfied, however, "[t]he state also must establish that the facts objectively are sufficient to establish probable cause." *Vasquez-Villagomez*, 346 Or. at 23. "When determining whether the state has established that the facts are objectively reasonable, the court looks at the totality of the circumstances, including the officer's training and experience." *Id*.

Here Defendants note the analysis of the objective element of the false-arrest, probable-cause analysis under state law is the same as the probable-cause analysis of Plaintiff's Fourth Amendment Claim. The Court agrees. The Court, therefore, concludes for the reasons set out in its analysis of Plaintiff's Fourth Amendment false-arrest claim that Defendants have not established as a matter of law that Officer Durbin had probable cause to arrest Plaintiff.

Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Plaintiff's First Claim for false arrest under state law.

## VI. Plaintiff's State-Law Claim of Assault

In her Second Claim Plaintiff alleges under state law that

Officer Durbin assaulted her when he "pointed his pistol at [her] without probable cause[, he] . . . acted with the intent to cause Plaintiff to fear he would shoot her[, and] . . . Plaintiff reasonably feared a harmful or offensive contact."  Defendants move for summary judgment on Plaintiff's Second Claim on the ground that Officer Durbin was justified in the amount of force he used against Plaintiff.

Under Oregon law

> civil assault occurs when (1) a person commits an act intending to cause a harmful or offensive contact with the person of another or to cause a belief by the other person that a harmful or offensive contact may immediately occur and (2) the other person reasonably believes such contact is likely to occur immediately.

*Woods v. Gutierrez*, No. 3:11-CV-01082-BR, 2012 WL 6203170, at *11 (D. Or. Dec. 12, 2012)(citing *Mays v. Huling Buick Co.*, 246 Or. 203, 204 (1967)).  Defendants assert Oregon Revised Statutes § 161.235(1) in combination with the decision in *Gigler v. City of Klamath Falls*, 21 Or. App. 753, 763 (1975), defeats Plaintiff's claim for assault under the circumstances of this case.

Oregon Revised Statutes § 161.235(1) provides:

> [A] peace officer is justified in using physical force upon another person only when and to the extent that the peace officer reasonably believes it necessary:  (1) To make an arrest or to prevent the escape from custody of an arrested person unless the peace officer knows that the arrest is unlawful.

In *Gigler* the Oregon Court of Appeals held when the "physical violence exerted by the officers against [the] plaintiff was no more than necessary to accomplish the legitimate purpose of fulfilling their duty," the force was reasonable and the officers did not commit assault.  21 Or. App. at 763.

Here the Court has already concluded Defendants have failed to establish as a matter of undisputed fact and as a matter of law that the force used against Plaintiff was not excessive. Defendants have also failed to establish that Officer Durbin did not use more force than was necessary under the circumstances, and the Court, therefore, also concludes Defendants are not entitled to summary judgment as to Plaintiff's state-law claim for assault.

Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Plaintiff's Second Claim for assault.

**VII. Plaintiff's State-Law Claim of Battery**

In her Third Claim Plaintiff alleges under state law that Officer Durbin committed battery when he "ordered Plaintiff to the floor at gunpoint with knowledge of her double mastectomy complications, he acted with intent to cause harmful or offensive contact to Plaintiff, and/or with knowledge or substantial certainty that a harmful or offense contact would occur."  Second Am. Compl. at ¶ 25.  Plaintiff also alleges Officer Durbin committed battery when he handcuffed her without probable cause

to do so.  Defendants, however, assert Oregon Revised Statutes § 161.235(1) together with the decision in *Gigler* defeats Plaintiff's claim for assault under the circumstances of this case.

Oregon courts have defined battery as "a 'voluntary act that is intended to cause the resulting harmful or offensive contact.'" *Ballard v. City of Albany*, 221 Or. App. 630, 640-41 (2008)(quoting *Walthers v. Gossett*, 148 Or. App. 548, 552, (1997)).  In *Gigler* the Oregon Court of Appeals held when the "physical violence exerted by the officers against [the] plaintiff was no more than necessary to accomplish the legitimate purpose of fulfilling their duty," the force was reasonable and the officers did not commit battery.  21 Or. App. at 763.

The Oregon Supreme Court has explained with respect to battery that

> an intentional act causing unpermitted physical contact with the person of another does not necessarily amount to . . . battery.  We must distinguish between an intent to do an act which may be wilful or wanton and which may result in contact, on the one hand, and an act involving an intent to cause harmful or offensive contact with the person, on the other. . . .  [B]attery involves more than an intentional act.  There must be the intent to injure.  However, the authorities plainly indicate that the word "injure" refers to legal injury, a violation of a protected right of the one assaulted.  It does not necessarily mean bodily and physical injury.  An offensive unpermitted touch may be a battery though no physical damage results.

*Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 4849 (1956).  The

48 - OPINION AND ORDER

court cautioned "courts have repeatedly fallen into error by referring to intentional or wilful acts without distinguishing between an intent to be reckless and an intent to hit the plaintiff." *Id*. at 49. The court identified four types of wrongful conduct: (1) simple negligence, (2) gross negligence, (3) negligence committed in a wanton manner, and (4) battery. *Id*. at 58. The court noted wanton conduct is defined as

> doing . . . an intentional act of an unreasonable character in disregard of a risk known to the actor, or so obvious that he must be taken to have been aware of it and so great as to make it highly probable that harm would follow, usually accompanied by a conscious indifference in consequences.

*Id*. at 58-59. Battery, on the other hand, requires "an actual intent not only to do an act but to cause personal injury." *Id*. In addition, "Oregon law cautions that the court should only infer . . . subjective intent to cause harm or injury as a matter of law when such subjective intent is the only reasonable inference that may be drawn from the insured's conduct." *Gakk Inc. v. Acceptance Cas. Ins. Co.*, No. CV 09-6282-MO, 2010 WL 3259905, at *2 (D. Or. Aug. 16, 2010). *See also Redman v. Morehead*, No. 3:12-CV-11-AC, 2012 WL 1253108, at *3 (D. Or. Apr. 13, 2012)(same).

Plaintiff asserts Officer Durbin knew when he insisted she lie face down and then handcuffed her that she was not supposed to lie on her chest because she had a "botched mastectomy" and a

collapsed expander.  The record does not contain any testimony by Officer Durbin at deposition as to his intent in requiring Plaintiff to lie face down or his intent in handcuffing Plaintiff.  In the absence of evidence of Officer Durbin's subjective intent, the Court cannot infer anything about his intent in handcuffing Plaintiff or in requiring her to lie face down.  The Court, therefore, concludes there is a genuine dispute of material fact as to Plaintiff's state-law claim for battery.

Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Plaintiff's Third Claim for battery.

**VIII. Plaintiff's State-Law Claim of Negligent Retention**

In her Fourth Claim Plaintiff alleges

> Defendant Gresham knew or should have known that Defendant Durbin had a history of physically dangerous behavior when confronting or arresting members of the public.
>
> At all times material herein, Defendant Gresham retained Defendant Durbin as a police officer when it was foreseeable that he would injure Plaintiff during his work as a police officer.
>
> Due to Defendant Gresham's negligent retention of Defendant Durbin, Defendant Durban was able to use and did use his position as a police officer to injure Plaintiff.

Second Am. Compl. at ¶¶ 32-34.  Defendants assert Plaintiff cannot establish as a matter of law that the City of Gresham negligently retained Officer Durbin.

In *Chesterman v. Barmon* the Oregon Court of Appeals explained:

50 - OPINION AND ORDER

> Liability is for negligently placing an employee
> with known dangerous propensities, or dangerous
> propensities which could have been discovered by a
> reasonable investigation, in a position where it
> is foreseeable that he could injure the plaintiff
> in the course of the work.  The duty to use
> reasonable care in hiring or retaining employees
> arises because it is foreseeable that the
> employee, in carrying out his employment, may pose
> an unreasonable risk of injury to others.

82 Or. App. 1, 4 (1986)(citing *Cain v. Rijken*, 300 Or. 706, 714-15, 717 P.2d 140 (1986)).  *See also Gresham v. Safeway, Inc.*, No. 08-cv-6241-AA, 2010 WL 437982, at *11 (D. Or. Feb. 3, 2010) (same).

Plaintiff relies on the following facts to support her negligent-retention claim:  (1) In 2008 a jury found Officer Durbin used excessive force against a plaintiff in violation of the Fourth Amendment in 2006 (*Macguire v. City of Gresham*, No. 07-cv-919-MO) and (2) in 2009 a plaintiff brought an action against Officer Durbin for, among other things, excessive force and arrest without probable cause for events that occurred in 2008, but this action was dismissed by stipulation *(Fussell v. Durbin*, 09-cv-1524-AA).

Defendants note Officer Durbin had been with the Gresham Police Department for 25 years at the time of the events in this case.  Defendants assert one adverse jury verdict over the course of 25 years is insufficient to establish a genuine dispute of material fact as to whether it was reasonably foreseeable that Officer Durbin posed an unreasonable risk of injury to others in

51 - OPINION AND ORDER

carrying out his employment.  The Court agrees.

In addition, Defendants point out that the events in *Macguire* and *Fussell* occurred in 2006 and 2008 respectively, which is 9-to-11 years before the events at issue here.  Between the time of the events in *Macguire* and *Fussell* and the events at issue in this matter, Defendant received approximately 800 hours of training.  Decl. of Captain Tim Gerkman at ¶ 3.  In addition, before and after the events of *Macguire* and *Fussell* Officer Durbin received several awards and commendations including Officer of the Year in 2002, Traffic Safety Officer of the Year in 2002, the Meritorious Service Award in 2008, a second Meritorious Service Award in 2010, a Medal of Valor in 2014, a second Medal of Valor in 2015, a second Traffic Safety Officer of the Year in 2017, a Lifesaving Award in 2017, and a Distinguished Service Medal when he retired in 2018.

The Court finds on this record that Plaintiff has not established a genuine dispute of material fact exists as to whether it was reasonably foreseeable that Officer Durbin posed an unreasonable risk of injury to others in carrying out his employment.  The Court also finds no reasonable juror could conclude under these circumstances that the City of Gresham negligently retained Officer Durbin.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's Fourth Claim for Negligent Retention.

## CONCLUSION

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion (#12) for Summary Judgment as follows:

1. **GRANTS** Defendants' Motion as to the impropriety of Officer Durbin as the defendant in Plaintiff's state-law claims and, therefore, **SUBSTITUTES** the City of Gresham as the defendant in Plaintiff's state-law claims;

2. **GRANTS** Defendants' Motion as to Plaintiff's Fourth Claim for negligent retention; and

3. **DENIES** Defendants' Motion as to Plaintiff's First, Second, Third, Fifth, and Sixth Claims because the Court concludes Defendants have not established as a matter of undisputed fact and/or law entitlement to judgment on these claims.

The following case-management dates remain in effect: a Joint Proposed Pretrial Order is due July 22, 2019; pretrial documents are due August 1, 2019; the Pretrial Conference is set on August 14, 2019; and trial is set on August 20, 2019.

IT IS SO ORDERED.

DATED this 11th day of July, 2019.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States Senior District Judge